

**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Ave. NW, Rm. 7513
Washington, DC  20530

Tel: (202) 616-5374

October 9, 2019

Hon. Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for the Second Circuit
40 Foley Square
New York, New York 10007

Via CM/ECF

      Re:    *Broidy Capital Management LLC & Elliott Broidy v. Jamal Benomar* (No. 19-236)

Dear Ms. Wolfe:

      By invitation of the Court dated August 26, 2019, and pursuant to 28 U.S.C. § 517 and Federal Rule of Appellate Procedure 29(a), the United States respectfully submits this letter brief as amicus curiae.  The Court's invitation stated:

> The Court requests that amicus address the scope of the commercial activity exception to diplomatic immunity.  Amicus may also examine any other issue relevant to the Court's adjudication of the case, such as the appropriate allocation of the burden of proof for asserting an exception to diplomatic immunity and the preliminary showing required for allowing jurisdictional discovery as to whether an exception to diplomatic immunity applies.

As we demonstrate below, diplomatic agents are absolutely immune from civil suits unless an exception applies.  The exception at issue in this case, Article 31(1)(c) of the Vienna Convention on Diplomatic Relations, applies only to "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions."  The provision's text, context, history, and purpose all make clear that the exception has no bearing where, as here, the relevant conduct occurred before the diplomat began serving as a diplomat with official functions.  The district court's dismissal of the suit based on lack of subject-matter jurisdiction should thus be affirmed.  The United States also offers its views on several other issues raised by this case.

**Interests of the United States**

The United States has strong interests in ensuring the proper interpretation and implementation of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, entered into force in U.S. Dec. 13, 1972, and the Agreement between the United Nations and the United States of America Regarding the Headquarters of the United Nations, signed at Lake Success, New York, June 26, 1947, 61 Stat. 3416 (UN Headquarters Agreement). The United States is a party to the Vienna Convention and to the UN Headquarters Agreement, and participated in their negotiation, and the government's interpretation of those treaties is "entitled to great weight." *Medellin v. Texas*, 552 U.S. 491, 513 (2008); *see Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982); *Swarna v. Al-Awadi*, 622 F.3d 123, 135 (2d Cir. 2010).

Furthermore, the United States has a substantial interest in the issues raised in this case because suits against diplomats in the courts of the United States can cause substantial harm to our foreign relations. The United States also has treaty obligations to respect the privileges and immunities accorded to diplomats, and it relies on similar commitments to protect U.S. diplomats serving abroad. The United States appreciates the opportunity to address the issues raised in the Court's invitation.

**Background**

**A.    Legal Framework**

1. For almost 200 years, foreign diplomats were absolutely immune from the criminal and civil jurisdiction of U.S. courts. In the Act for the Punishment of certain Crimes against the United States, 1 Stat. 112 (1790), Congress made clear that "any writ or process" against "any ambassador or other public minister of any foreign prince or state, authorized and received as such by the President of the United States, or any domestic or domestic servant of any such ambassador or other public minister * * * shall be deemed and adjudged to be *utterly null and void* to all intents, construction and purposes whatsoever." *Id.* § 25, 1 Stat. at 117-18 (emphasis added); *see* 22 U.S.C. §§ 252-254 (1976) (repealed 1978). As the Supreme Court recognized long ago, diplomatic immunity primarily serves the interests of the foreign sovereign rather than the diplomat because, among other reasons, "without such exemption, every sovereign would hazard his own dignity by employing a public minister abroad." *The Schooner Exch. v. McFaddon*, 11 U.S. 116, 138-39 (1812).

2. The Vienna Convention on Diplomatic Relations is an international treaty done in 1961 that has over 190 States who are parties to its provisions, including the United States and Morocco. *See* 23 U.S.T. at 3227-50. The Vienna Convention sets out a framework for diplomatic relations between sovereigns and specifies the privileges and immunities of diplomatic missions and their members. Under the Vienna Convention, "[t]he person of a diplomatic agent shall be inviolable." *Id.* at 3240 (Art. 29). The diplomat "shall enjoy immunity from the criminal jurisdiction of the receiving State." *Id.* (Art. 31(1)). The diplomat "shall also enjoy immunity from its civil and administrative jurisdiction," subject to specific and carefully delineated exceptions. *Id.* (Art. 31(1)). As this Court has explained, under the Vienna Convention, "current diplomatic envoys enjoy" almost "absolute

immunity from civil and criminal process." *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010).

The Vienna Convention further provides that anyone "entitled to privileges and immunities shall enjoy them from the moment he enters the receiving State to take up his post." 23 U.S.T. at 3245 (Art. 39(1)). Alternatively, if the person is "already in the [receiving State's] territory," then he is entitled to privileges and immunities "from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed." *Id.*

The Vienna Convention contains three exceptions to the near absolute immunity from civil jurisdiction accorded to diplomatic agents. Under Article 31(1), diplomats are not immune from civil jurisdiction "in the case of:

(a) a real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(b) an action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;

(c) an action relating to any *professional or commercial activity* exercised *by the diplomatic agent* in the receiving State outside his *official functions*."

23 U.S.T. at 3240-41 (Art. 31(1)(a)-(c)) (emphasis added).

The reference to "professional or commercial activity" appears in one other place in the Vienna Convention. Article 42 provides that "[a] diplomatic agent shall not in the receiving State practise for personal profit any professional or commercial activity." 23 U.S.T. at 3247.

Congress implemented Article 31(1) of the Vienna Convention domestically through Section 5 of the Diplomatic Relations Act. That provision states that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations * * * or under any other laws extending diplomatic privileges and immunities, shall be dismissed." 22 U.S.C. § 254d; *see Abdulaziz v. Metropolitan Dade Cty.,* 741 F.2d 1328, 1330 (11th Cir. 1984) ("The controlling statute on diplomatic immunity is the Diplomatic Relations Act of 1978 which incorporated the 1961 Vienna Convention on Diplomatic Relations and repealed the 1790 statute on diplomatic immunity that had been in effect unaltered for almost two hundred years.").

The Vienna Convention preserves the fundamental principle that diplomatic immunity inures to the benefit of the diplomat's home state: "[T]he purpose of such privileges and immunities *is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions*." 23 U.S.T. at 3230 (pmbl.) (emphasis added). That core

3

principle is recognized by both the executive and judicial branches. *E.g.*, U.S. Dep't of State, *Diplomatic and Consular Immunity: Guidance for Law Enforcement and Judicial Authorities* 5 (rev. Aug. 2019), https://go.usa.gov/xVAu4 (noting the "crucial point" that "[t]he purpose of these privileges and immunities is not to benefit individuals but to ensure the efficient and effective performance of their official missions on behalf of their governments" (emphasis omitted)); *Swarna*, 622 F.3d at 137 ("Sitting diplomats are accorded near-absolute immunity in the receiving state to avoid interference with the diplomat's service for his or her government."); *cf. Breard v. Greene*, 523 U.S. 371, 378 (1998) (per curiam) ("Any rights that the Consul General might have by virtue of the Vienna Convention exist for the benefit of Paraguay, not for him as an individual.").

3. Section 15 of the UN Headquarters Agreement extends the same protections accorded to diplomatic agents under the Vienna Convention to certain individuals at permanent missions to the United Nations. It provides that "[e]very person designated by a Member * * * as a resident representative with the rank of ambassador or minister plenipotentiary [and] such resident members of their staffs as may be agreed upon * * * shall, whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it." 61 Stat. at 3427. Under the UN Headquarters Agreement, members of permanent missions to the United Nations with diplomatic titles are provided with the same protections and have the same responsibilities as diplomatic agents under the Vienna Convention. *See Ahmed v. Hoque*, No. 01-7224, 2002 WL 1964806, at *4 (S.D.N.Y. Aug. 23, 2002) ("Both the United States and the United Nations agree that permanent representatives and ministers of foreign nations to the United Nations are entitled to full diplomatic immunity, that is, the immunities codified in the Vienna Convention."); *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 298 (2d Cir. 1993) (looking to the Vienna Convention to determine the content of immunities under the UN Headquarters Agreement).

### B.     Factual and procedural background

1. Plaintiffs Broidy Capital Management, LLC and Elliott Broidy sued Jamal Benomar in the Southern District of New York in July 2018, alleging that Benomar participated in a criminal scheme by the State of Qatar to discredit and embarrass Elliott Broidy in the media. JA10-25. Qatar allegedly targeted Broidy because it "was aware of [his] criticism of Qatar's policy and efforts to influence American opinion leaders." JA18.

Qatar allegedly "conducted a sophisticated computer hack" on plaintiffs' computer systems. JA18. On plaintiffs' "information and belief, as part of his participation in the hacking conspiracy, Defendant Benomar helped to mastermind the dissemination of stolen materials to the media and other third parties." JA19. The hack allegedly occurred "[i]n late 2017 and early 2018." JA18. According to the complaint, Benomar "had frequent telephonic contact between October 2017 and June 2018 with senior Qatari officials and members of the conspiracy * * * during times critical to the attack against Plaintiffs." JA12. Plaintiffs also referred to and attached a complaint they had filed in federal court in California against Qatar and others (but not Benomar). JA14. Neither the operative

complaint in this case nor the California complaint alleges any specific conduct by Benomar after June 2018.  JA20.

2.  Jamal Benomar is a Moroccan citizen who previously served as a high-ranking diplomat with the United Nations until July 1, 2017.  *See* JA210.  Benomar claimed in a declaration submitted in district court that since November 1, 2017, he "ha[s] served as a diplomat with the highest diplomatic rank of Minister Plenipotentiary at the Permanent Mission, as accredited by" Morocco.  JA201.  As plaintiffs noted during the litigation, however, "as of October 4, 2018, the State Department had not made any immunity determination regarding Defendant and was looking into his status, according to the United States Mission to the U.N."  JA106.

On September 21, 2018, the Moroccan Permanent Mission notified the U.S. Mission to the United Nations that Benomar enjoys the title of Minister Plenipotentiary, entitling him to the privileges and immunities of the Vienna Convention.  JA223.  On November 13, 2018, the U.S. State Department informed the Moroccan Mission to the United Nations that "Mr. Benomar has been accredited."  JA266; *see id.* ("The Department of State Diplomatic ID card should be in from Washington within * * * 3-5 business days.").  The State Department informed the parties to this litigation the following day that "the U.S. Mission to the UN has registered Mr. Benomar with diplomatic privileges and immunities as of November 13, 2018."  JA269.

Plaintiffs knew no later than September 28, 2018 that Benomar's diplomatic status would be at issue in the litigation.  *See* JA100-02 (Benomar's pre-motion letter stating that "Diplomatic Immunity" will be a ground on which Benomar will move to dismiss the complaint); SA46 (district court explaining that plaintiffs "were aware" that Benomar would raise diplomatic immunity "at least as of September 28 * * * and they likely were aware of that possibility before that").

On October 31, 2018, Benomar moved to dismiss the complaint for lack of subject-matter jurisdiction on grounds of diplomatic immunity under the Vienna Convention.  JA185.  Plaintiffs urged in response that immunity did not shield Benomar from suit because, they alleged, Benomar was not an accredited diplomat and in any event the Vienna Convention's commercial-activities exception to diplomatic immunity applied.  Plaintiffs argued that Benomar's alleged role in a cyberhacking conspiracy allegedly perpetrated by a foreign State satisfied the Vienna Convention's exception to immunity for "an action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions," 23 U.S.T. at 3241.  In reply, Benomar explained that the United States recently registered Benomar as a diplomat.  Dkt. No. 48.

3.  The district court dismissed plaintiffs' suit for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  SA1-55.

The court identified two different standards for determining how to allocate the burden of proof on diplomatic immunity.  SA17-20.  Under "the usual rule," "where a defendant challenges the court's subject-matter jurisdiction under Rule 12(b)(1), that puts the burden on the plaintiffs" to demonstrate jurisdiction by a preponderance of the evidence.

SA18.  Under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602 *et seq.*
(FSIA), by contrast, some courts have "require[d] the defendant to make out a prima facie
case that he is immune, which then shifts the burden back to plaintiffs to prove an exception
to immunity, with the ultimate burden of persuasion remaining with the defendant."  SA17-
18.  The court did not adopt that latter approach, although it stated that "I think here the
result would be the same, even if defendant had the initial prima facie burden and plaintiff
then had to show an exception."  SA18-19.

The district court found—and plaintiffs do not dispute on appeal—that Benomar is
currently serving as an accredited diplomat who is immune from suit unless an exception to
immunity applies.  SA20-30.  The court concluded that plaintiffs failed to prove by a
preponderance of the evidence that Benomar was involved in any "commercial" activity,
even accepting the allegations of the complaint as true.  The court described numerous
deficiencies in plaintiffs' "bald allegations that Benomar participated in (and was paid
millions of dollars for) participating in the scheme to illegally hack plaintiffs' computers and
distribute the results to the press."  SA37.  According to the court, "the complex hacking
conspiracy described in plaintiffs' complaint does not describe an example of the common
understanding of commercial activity, especially considering that plaintiffs allege that this
conspiracy was at the direction of a foreign government."  SA37-38.  The court stated that,
"[w]hile many crimes could be regarded as commercial because they are designed to make
money, here, the goal of the defendant and his alleged co-conspirators is alleged to be
political, not monetary."  SA38.  "More fundamentally," the court observed, "even if
cybercrime were considered to be commercial activity, plaintiffs have not established by a
preponderance of the evidence that Benomar was involved in the activity or did it for
money."  SA39.

The district court also denied plaintiffs' request for jurisdictional discovery, SA40-41;
noted that although it need not address derivative immunity, "if [the court] had to reach the
issue, [the court] likely would find that [it] lack[s] subject matter jurisdiction on grounds of
derivative sovereign immunity," SA44-45; and denied plaintiffs' request for leave to amend
the complaint, SA46-47.

4.  Immediately after the district court gave its opinion orally from the bench
granting Benomar's motion to dismiss, plaintiffs stated that they "would like to make an
offer of proof that we sought to file the amended complaint" that was attached to a letter
plaintiffs filed with the district court on November 30, 2018.  SA49; *see* JA325-51.  As with
the operative complaint, the proffered amended complaint did not contain any allegation
that Benomar engaged in allegedly wrongful conduct on or after September 21, 2018 (the
date plaintiffs allege in their proposed amended complaint that the United States was
notified of Benomar's current status as a Minister Plenipotentiary).  *E.g.*, JA339 (stating that
"Benomar was in frequent contact between October 2017 and June 2018 with members of
the conspiracy").  The proposed amended complaint does aver that "Benomar's trade or
business activity in the United States to advance Qatari interests also continues through the
present."  JA342.  As support, it states that, "[i]n September 2018, Benomar was appointed
to the Supervisory Board of Lagardère SCA (a multinational conglomerate)."  *Id.*  In
response to a similar allegation in the operative complaint, the district court had ruled that

Benomar's "position with the supervisory board of Lagardère SCA is not commercial activity."  SA36.  Plaintiffs do not seek review of that finding on appeal.

Argument

## I.    The defendant is entitled to diplomatic immunity

### A.    The Vienna Convention's commercial-activities exception does not apply to conduct before the diplomat obtained status-based immunity

To interpret a treaty such as the Vienna Convention, a court "begin[s] with the text of the treaty and the context in which the written words are used."  *Tachiona v. United States*, 386 F.3d 205, 216 (2d Cir. 2004).  But treaties "are construed more liberally than private agreements, and to ascertain their meaning [a court] may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties."  *Id.*

1.  The Vienna Convention provides that a diplomat "shall * * * enjoy immunity from its civil and administrative jurisdiction," subject to limited exceptions.  23 U.S.T. at 3240 (Art. 31(1)); *see id.* at 3245 ("Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed." (Art. 39(1)).  As the text of that provision makes clear, diplomatic immunity under the Vienna Convention is status-based.  Unless an exception to immunity applies, the diplomat "shall" enjoy immunity from a receiving State's "civil and administrative jurisdiction."  An individual with diplomatic status shall enjoy immunity not only with respect to actions based on conduct that occurred during the period in which the accredited diplomat serves in a diplomatic role, but also with respect to suits based on conduct that occurred before the individual became a diplomat.  As a result, "diplomatic immunity flowing from that status serves as a defense to suits already commenced" for conduct preceding the diplomat's service.  *Abdulaziz*, 741 F.2d at 1329-30; *see United States v. Khobragade*, 15 F. Supp. 3d 383, 387 (S.D.N.Y. 2014) ("[D]iplomatic immunity acquired during the pendency of proceedings destroys jurisdiction even if the suit was validly commenced before immunity applied."); *Fun v. Pulgar*, 993 F. Supp. 2d 470, 474 (D.N.J. 2014) (similar); *Republic of Philippines v. Marcos*, 665 F. Supp. 793, 799 (N.D. Cal. 1987) (similar).  As one leading commentator has explained, "if the defendant becomes entitled to immunity he may raise it as a bar to proceedings relating to prior events or to proceedings already instituted against him, and the courts must discontinue any such proceedings if they accept his entitlement."  Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 257 (4th ed. 2016).

Conversely, "diplomats lose much of their immunity following the termination of their diplomatic status."  *Swarna*, 622 F.3d at 133.  Under Article 39(2) of the Vienna Convention, "[w]hen the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so."  23 U.S.T. at

7

3245.  And "once a diplomat becomes a 'former' diplomat, he or she is not immune from suit for prior acts unless those acts were performed 'in the exercise of [the former diplomat's] functions as a member of the mission.' "  *Swarna*, 622 F.3d at 134 (quoting Art. 39(2)).

Unlike status-based immunity that applies to conduct preceding the diplomat's tenure, the Vienna Convention's commercial-activities exception is more circumscribed in its application, which depends on *when* the alleged conduct occurred.  That exception applies narrowly to "an action relating to any *professional or commercial activity* exercised *by the diplomatic agent* in the receiving State outside his *official functions*."  23 U.S.T. at 3241 (Art. 31(1)(c)) (emphasis added).  Before obtaining diplomatic status, an individual is not a "diplomatic agent" with "official functions."  The plain text of that provision thus demonstrates that it applies only to conduct undertaken during the diplomat's service.  Unlike immunity, the exception does not apply for acts that predate a diplomat's accreditation.  And unless another exception applies, the diplomat "shall" enjoy immunity from a receiving State's "civil and administrative jurisdiction."

This Court has previously resisted arguments to interpret Article 31(1)'s exceptions broadly.  In *Tachiona*, the Court held that any professional or commercial activities that occurred outside "the receiving State" did not satisfy the commercial-activities exception even if the defendant engaged in other conduct in the receiving State.  386 F.3d at 220.  A contrary ruling would have ignored the circumscribed textual scope of the exception.  *See also Baoanan v. Baja*, 627 F. Supp. 2d 155, 161 (S.D.N.Y. 2009) (describing Article 31(1)'s exceptions as "narrow").  Although not directly on point, *Tachiona* is instructive because it demonstrates that the Court will not construe Article 31(1)'s commercial-activities exception broadly to ignore its plain text and diminish the diplomatic protections provided by the Vienna Convention.

2.  The context of the Vienna Convention confirms that its commercial-activities exception does not apply where the alleged conduct occurred before the defendant obtained diplomatic status.  The only other provision in the Vienna Convention that refers to "professional or commercial activity" is Article 42, which provides that "[a] diplomatic agent shall not in the receiving State practise for personal profit any professional or commercial activity."  23 U.S.T. at 3247.  That reference clearly applies only to conduct by the diplomatic agent during his tenure as such.

Article 42 and Article 31(1)(c) thus work in tandem.  Article 42 sets forth the prohibition against diplomats engaging in professional or commercial activities while Article 31(1) lifts immunity for violations of that prohibition.  As the United States has previously explained, "Article 31(1)(c) works in conjunction with Article 42 to make clear that, if a diplomat does engage in such an activity, he does not have immunity from related civil actions."  Statement of Interest of the United States at 5, *Gonzalez Paredes v. Vila*, 479 F. Supp. 2d 187 (D.D.C. 2007) (Dkt. No. 23); *see* B.S. Murty, *The International Law of Diplomacy: The Diplomatic Instrument and World Public Order* 356 (1989) (" 'Professional or commercial' should be interpreted alike in Art. 31(1) and Art. 42"); Jonathan Brown, *Diplomatic Immunity: State Practice under the Vienna Convention on Diplomatic Relations*, 37 Int'l & Comp. L. Q. 53, 76 (1988) ("Diplomatic agents have a duty under Article 42 not to

engage in any such activities but, in the event that they do, they could be sued in respect of them."). In other words, "Article 31(1)(c) was intended to reach those rare instances where a diplomatic agent ignores the restraints of his office and, contrary to Article 42, engages in such activity in the receiving State." *Tabion v. Mufti*, 877 F. Supp. 285, 291 (E.D. Va. 1995), *aff'd*, 73 F.3d 535 (4th Cir. 1996).

Article 42's prohibition against diplomats engaging in professional or commercial activity for personal profit reaffirms that the commercial-activities exception in Article 31(1) likewise refers only to actions taken while the individual is a diplomatic agent. If the two provisions did not work in tandem, a diplomat could be subject to litigation concerning conduct that predates the diplomat's service. But that litigation would harm the sending State by interfering with the diplomat's service even though he is in full compliance with Article 42.

3. The Vienna Convention's negotiating and drafting history removes any doubt that the commercial-activities exception may be triggered only by conduct the diplomat engages in while he serves in that capacity. During that negotiating history, the scope and necessity of an exception to immunity for commercial activity performed concurrently with a diplomat's assignment was extensively debated. The discussion of the exception had nothing to do with conduct predating the diplomat's service.

The final version of the Vienna Convention evolved from an initial draft developed in a series of meetings of the United Nations International Law Commission (ILC), a body of international law experts. The draft for the Codification of the Law relating to Diplomatic Intercourse and Immunities proposed by the ILC's Special Rapporteur in 1955 contained no commercial-activities exception. During a 1957 ILC meeting, however, leading international law scholar and practitioner Alfred Verdross proposed an amendment providing an exception to immunity for an "act relating to a professional activity outside [the diplomatic agent's] official duties." 1957 U.N.Y.B. Int'l L. Comm'n 97. Verdross based the amendment on two sources: a 1929 resolution of the Institute of International Law, which provided that "[i]mmunity from jurisdiction may not be invoked by a diplomatic agent for acts relating to a professional activity outside his official duties," and the 1932 Harvard Draft Convention on Diplomatic Privileges and Immunities, which stated that "[a] receiving state may refuse to accord the privileges and immunities provided for in this convention to a member of a mission or to a member of his family who engages in a business or who practices a profession within its territory, other than that of the mission, with respect to acts done in connection with that other business or profession." *Id.* Neither Verdross's amendment nor its source material contemplated extending the exception beyond a diplomat whose activities fall outside official duties *as a diplomat*.

Discussion of Verdross's proposal focused on the actions of diplomats taken while in service. One ILC member "opposed the amendment as unnecessary" because "[d]iplomatic agents practically never engaged in any professional activity outside their official duties." 1957 U.N.Y.B. Int'l L. Comm'n 97 (comment of François). "If they did, and the receiving State objected, it could easily put an end to such activities by declaring the agent *persona non grata*." *Id.* A supporter of the amendment contended that "[t]he dignity itself of a diplomatic agent required that he should not engage in activities outside his official duties."

9

*Id.* at 98 (comment of El-Erian). And the Special Rapporteur expressed his view that, "[t]o engage in a professional activity outside [the diplomat's] official duties would impair the dignity not merely of the diplomatic agent himself but of the whole mission." *Id.* (comment of Sandström). Indeed, the Special Rapporteur considered "the whole idea of a diplomatic agent engaging in any professional activity *outside his official duties* as repugnant." *Id.* (emphasis added). The discussion did not address prior commercial activities undertaken before a diplomat begins service, and instead centered on diplomats who act in derogation of their diplomatic status.

When the United States commented that the proposed commercial-activities exception went beyond existing international law, the Special Rapporteur responded by describing the exception in terms of activity that was inconsistent with diplomatic status: "It would be quite improper if a diplomatic agent, ignoring the restraints *which his status ought to have imposed upon him*, could, by claiming immunity, force the client to go abroad in order to have the case settled by a foreign court." *Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur*, U.N. Doc. A/CN.4/116, at 55-56 (emphasis added). No mention was made of the exception applying to abrogate immunity based on conduct that occurred before any diplomatic status should have "imposed" any "restraints" on the individual.

The ILC's final draft addressing "[i]mmunity from jurisdiction" provided an exception for "[a]n action relating to a professional or commercial activity exercised by the diplomatic agent in the receiving State, and outside his official functions." 1958 U.N.Y.B. Int'l L. Comm'n 98. The Commentary to the provision reinforced that the exception is limited to acts inconsistent with the diplomatic agent's official functions. The Commentary explained that the exception "arises in the case of proceedings relating to a professional or commercial activity exercised by the diplomatic agent outside his official functions." *Id.* It also noted that, although "activities of these kinds are normally wholly inconsistent with the position of a diplomatic agent, and that one possible consequence of his engaging in them might be that he would be declared *persona non grata*," the exception was necessary because "such cases may occur and should be provided for, and if they do occur the persons with whom the diplomatic agent has had commercial or professional relations cannot be deprived of their ordinary remedies." *Id.*

The ILC's draft convention was considered at the United Nations Conference on Diplomatic Intercourse and Immunities in 1961. The Department of State's instructions to the United States delegation at that Conference expressed the following understanding of the exception:

> Although states have generally accorded complete immunity to diplomatic agents from criminal jurisdiction, there has been a reluctance in some countries to accord complete immunity from civil jurisdiction particularly where diplomats engage in commercial or professional activities which are unrelated to their official functions. *While American diplomatic officers are forbidden to engage in such activities in the country of their assignment, other states have not all been so inclined to restrict the activities of their diplomatic agents.* Subparagraph (c) of paragraph 1 would enable persons in the receiving State

who have professional and business dealings of a non-diplomatic character with a diplomatic agent to have the same recourse against him in the courts as they would have against a non-diplomatic person engaging in similar activities.

*Exemption From Judicial Process*, 7 Dig. of Int'l L. 406 (1970) (emphasis added). The United States' contemporaneous view thus interpreted the commercial-activities exception to focus on the kind of for-profit activity in which diplomats should not be engaging while serving as a diplomatic agent of the sending State.

During the debate at the Diplomatic Conference, the delegate from Colombia proposed what would become Article 42 of the Vienna Convention, which as noted above provides that "[a] diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity." 23 U.S.T. at 3247; *see* 1 *U.N. Conference on Diplomatic Intercourse and Immunities: Official Records* 211-13 (1962), U.N. Doc. A. CONF.20/14. The Conference delegates saw Article 31(1)(c)'s commercial-activities exception and Article 42's ban on commercial activities as closely intertwined. The delegates from Colombia and Italy even proposed deleting the commercial-activities exception in Article 31(1)(c) as unnecessary in view of the prohibition in Article 42. The Conference voted, however, to retain the exception because, among other reasons, there could be no assurance that diplomatic agents would not engage in prohibited activities. *See id.* at 19-21.

Because Articles 42 and 31(1)(c) are so closely tethered to each other, U.S. government officials "have consistently interpreted the [commercial-activities exception] narrowly, advising Congress during its consideration of the Vienna Convention in 1965 and passage of the Diplomatic Relations Act in 1978 that the 'commercial activity' exception was 'minor' and 'probably meaningless' because it *merely exposed diplomats to litigation based upon activity expressly prohibited in Article 42.*" *Tabion v. Mufti*, 73 F.3d 535, 538 n.6 (4th Cir. 1996) (emphasis added); *see Diplomatic Immunity: Hearings on S. 476, S. 477, S. 478, S. 1256, S. 1257 and H.R. 7819 Before the Subcomm. on Citizens and S'holders Rights and Remedies of the S. Comm. on the Judiciary*, 95th Cong. 32 (1978) (statement of Bruno Ristau, Chief, Foreign Litigation Unit, U.S. Dep't of Justice) ("The [commercial-activities] exception * * * is probably meaningless, because another provision of the convention, article 42, prohibits them from carrying on any commercial activity for personal profit while they are diplomatic agents."). Here again, as with every stage of the negotiating and drafting history, the discussion of the commercial-activities exception involved the specific question of a diplomat who engages in professional or commercial activities for profit while serving as a diplomat. This Court should not adopt an interpretation of the commercial-activities exception that is "contrary to the drafting history." *Swarna*, 622 F.3d at 137 (examining the drafting history to interpret Vienna Convention Article 39).

4. As described above, the primary purpose of diplomatic immunity under the Vienna Convention "is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions." 23 U.S.T. at 3230 (pmbl.). That purpose dovetails with the purpose of Article 31(1)(c), which lifts immunity against a diplomat whose conduct does not comply with Article 42 in violation of his duty to serve as an agent of the sending

State rather than as an individual pursuing personal profit. The efficient performance of a diplomatic mission's functions could be undermined if a diplomat who has acted consistently with Article 42 nonetheless may be sued for conduct that predates the individual's status as a diplomatic agent. The purpose of diplomatic immunity thus supports what the text, context, and history of the Vienna Convention make clear: The commercial-activities exception does not allow suit against a diplomat based on alleged conduct predating the individual obtaining diplomatic status.

## B.    Benomar's alleged conduct occurred before he obtained status-based immunity

According to the record in this case, the Moroccan Permanent Mission to the United Nations notified the U.S. Mission to the United Nations on September 21, 2018 that Benomar enjoys the title of Minister Plenipotentiary entitled to the privileges and immunities of diplomats under Article 31(1) of the Vienna Convention. *See* JA223; *see* SA25 ("The defendant provided exhibits that reflect that no later than September 21 or October 5, 2018, Morocco expressly notified the U.S. of Benomar's appointment as a Minister Plenipotentiary.").[1] The State Department thereafter recognized his diplomatic status and issued him appropriate credentials. And the State Department's certification of an individual as a diplomat "is conclusive evidence as to the diplomatic status of [the] individual." *United States v. Al-Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004); *e.g.*, *Abdulaziz*, 741 F.2d at 1329, 1331 (noting that "courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status," and that "once the United States Department of State has regularly certified a visitor to this country as having diplomatic status, the courts are bound to accept that determination"); *In re Baiz*, 135 U.S. 403, 421 (1890) (noting that "the certificate of the secretary of state * * * is the best evidence to prove the diplomatic character of a person"). Benomar is therefore entitled under Article 31 of the Vienna Convention to status-based immunity from the civil jurisdiction of U.S. courts, unless an exception applies.

The commercial-activities exception to immunity does not apply because none of the alleged conduct in the operative complaint (or the proposed amended complaint) occurred after September 21, 2018—the earliest date on which Benomar could have received status-based immunity. The complaint asserts in passing that Benomar's activities "continu[ed]" to the present. JA19 (operative complaint), JA342 (proposed amended complaint). But such conclusory allegations plainly fail to demonstrate with specificity that this action relates to any outside professional or commercial activity Benomar engaged in after

---

[1] Neither the September 21 nor the October 5 notification complied with proper procedures. Because the personnel of Permanent Missions are accredited to the United Nations, and not to the United States, Permanent Missions must send notifications to the United Nations, with the United Nations then submitting a notification to the U.S. Mission. According to the Department of State, the U.S. Mission did not receive a notification from the United Nations describing Benomar as a Minister Plenipotentiary until October 11, 2018. But all alleged conduct occurred before September 21, 2018, so any discrepancy between the dates is inconsequential.

September 21. *E.g.*, *Gomes v. ANGOP, Angl. Press Agency*, No. 11-0580, 2012 WL 3637453, at *9 (E.D.N.Y. Aug. 22, 2012) (rejecting "wholly conclusory" allegation that a diplomat engaged in money laundering sufficient to trigger Article 31(1)'s commercial-activities exception); *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241 (2d Cir. 2002) ("bald assertions" insufficient to defeat a motion to dismiss against a foreign sovereign based on immunity).

Moreover, it does not matter that Benomar claimed to be immune because of his purported diplomatic status during the time period in which, according to the complaint, he allegedly engaged in wrongdoing. And although Benomar was recognized by the United Nations and the State Department in August 2018 as a "Special Advisor" at the Moroccan Permanent Mission to the United Nations that entitled him to some privileges and immunities apart from the Vienna Convention, SA7, he did not have status as a diplomatic agent. As plaintiffs stressed throughout this litigation, JA106, JA242, U.S. recognition is conclusive, but the United States did not recognize Benomar's diplomatic-agent status until September 21, 2018 at the earliest. No person or government may "unilaterally assert diplomatic immunity." *United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984); *see United States v. Kuznetsov*, 442 F. Supp. 2d 102, 106 (S.D.N.Y. 2006) (rejecting the defendant's argument that he qualified as a diplomatic agent because the United States did not recognize him as such). Because Benomar did not have recognized diplomatic status during the period when the alleged conduct occurred, the commercial-activities exception cannot apply.[2]

### C.    Other factors may be relevant to whether the operative complaint alleges conduct sufficient to satisfy the commercial-activities exception

The commercial-activities exception is inapplicable here because the alleged conduct predated Benomar's status as a recognized diplomat. Accordingly, this Court need not address whether the same conduct would constitute a "commercial activity" if an individual engaged in it while serving as a recognized diplomat. Nonetheless, in light of the Court's invitation, the United States provides the following views on that question.

1. The commercial-activities exception "relates only to trade or business activity engaged in for personal profit." *Tabion*, 73 F.3d at 537. Put differently, "diplomats are

---

[2] Although Benomar raised the issue of diplomatic immunity in district court, he did not rely on the arguments offered here. As plaintiffs acknowledge, however, a defendant's diplomatic immunity strips a court of jurisdiction. Broidy Br. 33 ("Diplomatic immunity is much like foreign sovereign immunity in that it is a complete bar to this Court's jurisdiction."). As several courts have ruled that this issue goes to subject-matter jurisdiction, it cannot be forfeited. *See Brzak v. United Nations*, 597 F.3d 107, 114 (2d Cir. 2010) (affirming the district court's dismissal for lack of subject-matter jurisdiction because defendants were entitled to diplomatic immunity); *Khobragade*, 15 F. Supp. 3d at 388 ("diplomatic immunity is a jurisdictional bar"); *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 47 (2d Cir. 1996) ("lack of subject matter jurisdiction is not waivable by the parties").

engaged in 'professional or commercial' activity within the meaning of the [Vienna] Convention when they engage in a business, trade or profession for profit." U.S. Statement of Interest, *supra*, at 14; *see* SA33 (district court ruling that the exception includes a for-profit component); *Diplomatic Immunity Legislation: Hearing on H.R. 7819 Before the S. Comm. on Foreign Relations*, 95th Cong. 49 (1978) (statement of Horace F. Shamwell, Deputy Ass't Legal Adviser, U.S. Dep't of State) (commercial activity "relates primarily to private business dealings, such as engaging in some outside profitmaking activity").

Plaintiffs do not dispute that conduct must be engaged in for the diplomat's profit to qualify for the commercial-activities exception. But the district court found that plaintiffs offered only "bald allegations that Benomar participated in (and was paid millions of dollars for) participating in the scheme to illegally hack plaintiffs' computers and distribute the results to the press." SA37. In the absence of any actual evidence that Qatar paid Benomar, the court found that "plaintiffs have not established by a preponderance of the evidence that Benomar was involved in the activity or did it for money." SA39.

Record evidence is consistent with those findings. Benomar stated under penalty of perjury that he "do[es] not engage in any systematic trade or business activity within the United States." JA201. He also declared under penalty of perjury that he has "received no remuneration from the state of Qatar for [his] foreign policy advice regarding the resolution of the conflict with its neighbours." JA278. Even absent that evidence, however, plaintiffs failed to demonstrate by a preponderance of the evidence that Benomar engaged in any professional or commercial activity for profit. As the district court explained, "[t]he only evidence [plaintiffs] provided was a few lines of a deposition transcript in which Joseph Allaham states he is owed $5- to $10 million by Qatar and was thinking of suing Benomar over it because he could not get a straight answer about it." SA39; *see* JA249. "[T]his inscrutable excerpt does not show that Benomar was paid anything, let alone that he was paid for participating in the hacking conspiracy, or even that Allaham was; nor does it show that Benomar was paid or agreed to pay anyone." SA39; *see* JA278 (Benomar stating that "I am not party to any contract with or owe any contractual obligations or money to Mr. Joey Allaham").

2. Had the plaintiffs shown that Benomar was paid for the conduct alleged in the complaint, it is still not clear that the commercial-activities exception would apply to the factual allegations in this case. As explained above, the Court need not address that question here. If it does, the United States respectfully suggests considering the following points.

First, even if a defendant is paid for his conduct, that circumstance does not by itself compel the conclusion that the activity is professional or commercial; for-profit conduct is a necessary but not sufficient element of the commercial-activities exception. A critical factor in this analysis is the nature of the activities and whether those activities are "continuous" and involve "a *business, trade or profession* for profit." U.S. Statement of Interest, *supra*, at 9, 14, 20 (emphasis added).

Second, there are circumstances, particularly at a country's mission to international organizations, in which members of different missions collaborate closely to advance a

shared objective. A member of one mission might, as part of his official functions, advise another State on how to advance that State's objectives, including by providing technical or other assistance. The United States would have significant concerns if a foreign State permitted a civil case against a U.S. diplomat serving at a U.S. Embassy to proceed for acts taken on behalf of the United States merely because another State benefited from or was involved in those acts. And that would be true irrespective of whether the foreign State agreed with the appropriateness of the conduct. The presence or absence of diplomatic immunity does not turn on "the propriety of [a sovereign's] political conduct, with the attendant risks of embarrassment at the highest diplomatic levels." *Heaney v. Government of Spain*, 445 F.2d 501, 504 (2d Cir. 1971).

Assuming, contrary to this record, that Benomar had been a diplomatic agent since 2017, Benomar has indicated that any actions he took on behalf of a different State were done with, at a minimum, Morocco's acquiescence. Although Morocco has not provided a statement as to whether Benomar's alleged actions were performed in the course of his official functions, Benomar has indicated that his conduct fell within his diplomatic responsibilities. Benomar declared that he provided "foreign policy advice to a number of regional actors, including Qatar, regarding how best to achieve a peaceful resolution to these conflicts and the steps [he] believed were necessary not only to resolve the blockade and bring an end to the war in Yemen, but, more generally, how to reconcile differences among the states so that the region might enjoy a greater measure of stability and harmony." JA202. Benomar also stated that he "maintained contact with all the main Yemeni political actors and advised a number of regional and international actors, at their request, *and in close consultation and cooperation with the government of Morocco.*" *Id.* (emphasis added). And he declared that his "communications to and with representatives of Qatar are consistent with [his] diplomatic responsibilities to Morocco," and "are intended to further the interests of Morocco." JA278.

Third, even seemingly commercial activity may be diplomatic when it is done at the behest of the sending State. There are circumstances in which "there may sometimes be difficulties in determining the limits of diplomatic functions and the boundaries between diplomatic and commercial" functions. Denza, *supra*, at 254. But "[a] diplomat who is instructed to undertake an activity, such as export promotion or assistance to businessmen, which could be argued to be commercial, * * * is acting within *his* official functions and should be entitled without question to personal diplomatic immunity." *Id.*

The United States offers this discussion so that the Court has a more complete picture of the narrow scope of the commercial-activities exception even though applying these general principles to an individual who was not recognized by the United States as a diplomat is difficult because the principles all contemplate that the alleged tortfeasor engaged in the acts *as a diplomat*. If the Court were to address these issues, it should make clear that, regardless of how it rules in this particular case, "professional or commercial activity" under Article 31(1)(c) should be interpreted narrowly and "official functions" should be interpreted broadly so that even arguably professional or commercial activity does not subject a defendant to suit where the defendant engaged in the conduct at the instruction of the sending State.

## II.    This Court need not address the appropriate allocation of the burden of proof for asserting an exception to diplomatic immunity, but if it does address the issue it should rule that the plaintiff carries the burden

This Court also need not address who bears the burden to prove jurisdiction in a case involving diplomatic immunity from suit.  The commercial-activities exception has no bearing where, as here, the conduct occurred before the diplomat obtained immunity. Alternatively, plaintiffs' threadbare allegations about Benomar engaging in any activity for profit could not satisfy any burden to establish an exception based on commercial activities. Against that backdrop, regardless of who carries the burden of production and persuasion, Benomar is entitled to immunity.

If this Court were to address the issue, however, it should hold that once a diplomat's status is demonstrated, a plaintiff in a suit against a diplomat carries the burden to establish subject-matter jurisdiction by establishing, through a preponderance of the evidence, that an exception to immunity applies.  *E.g.*, *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84 (2d Cir. 2001) (adopting a similar standard on a motion to dismiss for lack of subject-matter jurisdiction on the basis of sovereign immunity); *see also* S. Rep. No. 95-958, at 5 (1978) (noting that a prior version of the bill that would be enacted as the Diplomatic Relations Act of 1978 had been revised because that version "might be read to impose on the courts a new special motion procedure in immunity cases").  Under the ordinary standard for subject-matter jurisdiction, "when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

Plaintiffs have urged this Court to adopt a burden-shifting framework borrowed from cases interpreting and applying the FSIA, which governs the jurisdiction of courts in suits brought against foreign states and their agencies and instrumentalities.  Several courts have held that, "[o]nce the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, *although the ultimate burden of persuasion remains with the alleged foreign sovereign.*"  *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (emphasis added; citation omitted); *e.g.*, *Virtual Countries*, 300 F.3d at 241; *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989) (per curiam).  That view about the burden of persuasion appears to have been derived from the FSIA's legislative history, which mistakenly described sovereign immunity as an affirmative defense that must be established by the defendant.  *See* H.R. Rep. No. 94-1487, at 17 (1976) (noting that, because "sovereign immunity is an affirmative defense which must be specially pleaded," "the burden will remain on the foreign state to produce evidence in support of its claim of immunity); *id.* ("Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity.  The ultimate burden of proving immunity would rest with the foreign state.").

16

That snippet of legislative history is inconsistent with the text of the FSIA. "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Because "subject-matter jurisdiction turns on the existence of an exception to foreign sovereign immunity," even if "the foreign state does not enter an appearance to assert an immunity defense, a district court still must determine that immunity is unavailable under the Act." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983); *see also Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 799 n.15 (7th Cir. 2011) ("the House Report got this point wrong"); *Frolova v. U.S.S.R.*, 761 F.2d 370, 373 (7th Cir. 1985) (per curiam) (characterizing the legislative history's description of sovereign immunity as an affirmative defense as "not entirely accurate"); *cf. Walters v. Industrial & Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) (acknowledging that whether "sovereign immunity is an affirmative defense * * * is debatable"). And if foreign sovereign immunity is not an affirmative defense, there is no reason to "rest" the "ultimate burden of proving immunity" with the "foreign state."

This Court need not address the issue of burden of proof in this case. Regardless of which standard the Court applies, Benomar is entitled to immunity because the commercial-activities exception does not apply to conduct that predates service as a diplomat or, alternatively, plaintiffs' "bald assertions" of remuneration are "not sufficient to defeat the motion to dismiss" even under the FSIA standard. *Virtual Countrie*s, 300 F.3d at 241. If the Court were to address which party carries the burden to establish immunity, however, the United States respectfully requests that the Court should not transplant the errant statement in some FSIA cases concluding that the foreign state carries the ultimate burden of proving immunity into this context; instead, the Court should hold that once the defendant has established that he is presumptively entitled to diplomatic immunity, the plaintiff has the burden to establish by a preponderance of the evidence that an exception to immunity applies. The diplomat does not have any ultimate burden of persuasion.

## III.    This Court's precedents addressing sovereign immunity provide useful guidance as to the preliminary showing required for allowing jurisdictional discovery

The United States takes no position on whether the district court abused its discretion when it denied plaintiffs jurisdictional discovery to establish an exception to immunity. We briefly note, however, that concerns that have led this Court to take a circumspect approach to allowing jurisdictional discovery in cases addressing foreign sovereign immunity apply with even greater force to cases involving diplomatic immunity.

In *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193 (2d Cir. 2016), the Court upheld the district court's denial of jurisdictional discovery in an FSIA case involving a lawsuit against two of Ecuador's instrumentalities. The Court explained that sovereign immunity is immunity from "the expense, intrusiveness, and hassle of litigation." *Id.* at 206; *e.g.*, *Phoenix Consulting*, 216 F.3d at 40 ("In order to avoid burdening a sovereign that proves to be immune from suit * * * jurisdictional discovery should be carefully controlled and limited."); *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 146 n.6 (2014) (noting "comity interests and the burden that the discovery might cause to the foreign state" as factors for a court to consider when addressing discovery requests against a foreign

17

sovereign). In light of the need for immunity to protect against the burdens of litigation, "a district court may deny jurisdictional discovery demands made on a foreign sovereign if the party seeking discovery cannot articulate a 'reasonable basis' for the court first to assume jurisdiction." *Arch Trading*, 839 F.3d at 206-07.

This Court has also recognized in the context of litigation brought under the FSIA that plaintiffs should be able to "specify * * * what discovery they might seek," and jurisdictional discovery must extend no further than to "verify allegations of specific facts crucial to an immunity determination." *Arch Trading*, 839 F.3d at 207. A plaintiff who offers only "conclusory" allegations cannot obtain jurisdictional discovery, because "[t]he FSIA protects defendants from a fishing expedition." *Id.* That principle also applies when conduct involves allegations among defendants and others, precluding speculative requests to "examine the details of the relationships" between defendants and others identified in a complaint. *Id.*; *see id.* at 207-08 (noting "the distinction between activities of defendants and of the entities alleged to be conducting commercial activity in the United States").

Like a foreign state under the FSIA, diplomatic agents are "presumptively entitled to immunity" under the Vienna Convention and "to dismissal" under the Diplomatic Relations Act and should be shielded against the expense, intrusiveness, and hassle of litigation. *Devi v. Silva*, 861 F. Supp. 2d 135, 141 (S.D.N.Y. 2012). To guard against the dilution of that principle, this Court has recognized in the FSIA context that district courts must "be 'circumspect' in allowing discovery before the plaintiff has established that the court has jurisdiction." *Arch Trading*, 839 F.3d at 206. Indeed, those concerns carry even greater force in cases against diplomatic agents, where the exceptions to immunity are even narrower than the exceptions to foreign sovereign immunity in the FSIA and where litigation has the potential to implicate principles of diplomatic inviolability and other protections afforded to diplomats under the Vienna Convention.

## IV. A district court should be allowed to consider immunity from suit as a factor when deciding whether to grant leave to amend

The district court stated that plaintiffs "have not claimed to have any evidence not already available to them," SA47, and "plaintiffs have not suggested that they are in possession of facts that would cure the deficiencies" the court identified, SA46-47. Based on those circumstances, the court ruled that allowing plaintiffs to file an amended complaint would be futile because "the problem here is not a pleading deficiency that plaintiffs can fix," but rather "an absence of evidence." SA47.

The United States takes no position addressing whether the district court abused its "broad discretion" when it denied plaintiffs' leave to amend. *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000). But the United States respectfully states that, even if it is not absolutely clear that "amendment would be futile," *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006), a diplomat's potential immunity from suit may properly inform a district court's analysis of whether leave to amend should be granted based on potential prejudice to the defendant, *see McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (noting "undue prejudice to the opposing party" as a proper basis to deny leave to amend). Allowing leave despite likely futility could threaten the diplomat's immunity from suit by

18

imposing on the diplomat the burden of defending against a suit that has already been found to be deficient.

## Conclusion

The parties do not dispute that Jamal Benomar is a diplomat or that he is entitled to diplomatic immunity under the Vienna Convention unless an exception applies. The only possible exception identified by plaintiffs—the commercial-activities exception—has no bearing on this case because the conduct at issue occurred before Benomar's status-based immunity attached. Alternatively, plaintiffs cannot defeat dismissal because, as the district court properly found, they have not adequately shown that Benomar engaged in any professional or commercial activity for profit. Benomar is thus entitled to diplomatic immunity and the district court properly dismissed the suit for lack of subject-matter jurisdiction. The United States does not minimize the possibility of "harsh implications" for a plaintiff whose suit must be dismissed because of the defendant's diplomatic immunity. *Sabbithi v. Al Saleh*, 605 F. Supp. 2d 122, 130 (D.D.C. 2009). "But it must be remembered that the outcome merely reflects policy choices already made" when the United States became party to the Vienna Convention and when Congress enacted the Diplomatic Relations Act. *Tabion*, 73 F.3d at 539; *e.g.*, *767 Third Ave. Assocs.*, 988 F.2d at 302 ("[F]ederal courts are an inappropriate forum to accomplish the amendment of a multilateral treaty to which the United States is a party.").

Respectfully submitted,

MARIK A. STRING
*Acting Legal Adviser*
*Department of State*
*Washington, D.C. 20520*

JOSEPH H. HUNT
  *Assistant Attorney General*

SHARON SWINGLE
*/s/ Martin Totaro*
MARTIN TOTARO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5374*
  *martin.totaro@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This letter brief complies with this Court's August 26, 2019 Order inviting the United States' amicus participation because the letter brief does not exceed "twenty single-spaced pages."

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 9, 2019, I electronically filed the foregoing letter brief with the Clerk of the Court by using the appellate CM/ECF system.  I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Martin Totaro*
Martin Totaro